UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| THOMAS CANNON, )<br>)<br>Petitioner, )<br>v. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Respondent. ) | Case No. 07-CV-2044 |

**OPINION**

On February 26, 2007, Petitioner Thomas Cannon, through his counsel, filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (#1) with an accompanying affidavit. On July 6, 2007, the United States of America filed its Response (#6). Following a March 13, 2008, evidentiary hearing, Petitioner filed his Closing Argument (#14). The United States filed its Response (#16) on August 15, 2008. For the reasons that follow, Petitioner's Motion to Vacate, Set Aside, or Correct Sentence (#1) is DENIED.

BACKGROUND

On October 23, 2003, Petitioner was charged by indictment with possession of 50 or more grams of cocaine base (crack) with the intent to distribute it in violation of 21 U.S.C. §§ 841 (a)(1) and (b)(A)(1).[1] Bruce Cowan was retained to represent Petitioner. On November 14, 2003, Petitioner filed a motion to suppress, challenging the validity of the traffic stop which led to his arrest. Petitioner withdrew the motion to suppress at a hearing held on November 18, 2003. On December 4, 2003, a final pretrial conference was held. Attorney Cowan informed the court that he was attempting to secure the appearance of Petitioner's brother, Clarence Cannon, from Kuwait where he was stationed on military

---

[1] All proceedings in this matter until December 22, 2005, were held before the Honorable Harold A. Baker. Judge Baker recused himself from Petitioner's criminal case at that time and Petitioner's case was reassigned to this court.

duty and that his testimony was "absolutely crucial to the defense." The court informed Cowan that it would delay the trial if necessary to allow Clarence to be present.

Petitioner's trial began on December 8, 2003. Prior to jury selection, Cowan indicated he wished to renew his motion to suppress because Clarence was present. An evidentiary hearing on the motion was then conducted. The evidence introduced at the hearing indicated that Clarence was driving a Chevy Trailblazer in which Petitioner was a passenger on September 3, 2003. Petitioner's two-year old son was also in the back seat of the car. Clarence had rented the vehicle from Enterprise Leasing in Rantoul, Illinois on August 18, 2003. During the execution of a stop of the vehicle, officers found marijuana, cocaine, and crack in the vehicle. Petitioner sought to suppress the drugs and an alleged subsequent confession of Petitioner, arguing that the traffic stop was invalid. The court heard the testimony of Petitioner, Clarence, and Kankakee County Sheriff's Deputies Dustin Brown and Edward Zopf. Deputies Brown and Zopf testified they stopped the vehicle because Clarence failed to yield when he was exiting the driveway of a private residence. Petitioner and Clarence testified that they properly stopped before entering the roadway. At the conclusion of the hearing, Judge Baker found the testimony of Deputies Brown and Zopf to be credible and found Petitioner and Clarence not to be credible. Accordingly, the motion to suppress was denied.

At trial, the Government first presented the testimony of Deputies Brown and Zopf. Their testimony indicated as follows. Brown and Zopf were on patrol on September 3, 2003, when they observed the Trailblazer driven by Clarence and in which Petitioner was a passenger fail to yield while departing from a residence in Hopkins Park, Illinois. The officers approached the vehicle and asked the occupants for identification. Petitioner initially identified himself as Lawrence Jones. The officers checked both Clarence and Petitioner to see if they had warrants out for their arrests and to insure Clarence had a valid driver's license. When the officers did a check on the name Lawrence Jones with the date of birth provided by Petitioner, the results indicated there was no record on file. The officers

informed Petitioner that providing a false name was against the law. Petitioner then accurately provided his identification and indicated there was an outstanding warrant for his arrest. Petitioner was then arrested. When Petitioner was searched incident to this arrest, the officers found a wallet on his person containing $2,312 in cash. Deputy Brown then returned to the vehicle and asked Clarence if there were any drugs in the vehicle. Clarence did not respond. Brown then asked if he could search the vehicle and if there were any personal use amounts of drugs located in it. Clarence then reached into the center console and handed Brown two baggies containing marijuana. Clarence was then removed from the vehicle and placed in the back of the officers' squad car while the vehicle was searched.

The officers found $2,000 in cash after conducting a search of Clarence's person. When the officers conduced a search of the vehicle, they found two additional baggies containing marijuana in the center console, one large baggie containing marijuana under the driver's seat, one large baggie containing 64 grams of cocaine in the glove compartment, and another large baggie containing 59.5 grams of crack cocaine in the glove compartment. The officers then advised Petitioner of his Miranda rights. Petitioner indicated to Brown and Zopf that the drugs in the vehicle belonged to him and not his brother. Petitioner further offered Brown and Zopf all the money he and Clarence had on them if the officers would dispose of the cocaine.

Chad Gessner, an officer with the Kankakee Area Metropolitan Enforcement Group (KAMEG) also testified at trial. Gessner testified he arrived at the scene of the stop and transported Petitioner to a county administration building. After he arrived at the administration building, Petitioner was again advised of his Miranda rights. Petitioner then informed Gessner that he obtained the drugs from a man called Scony. Gessner recognized the name Scony as being a nickname for Patrick Spain. Petitioner stated he was a middleman for Scony and was supposed to deliver the drugs to Joe Jones.

Officers William Backus and Deann Regas, also of KAMEG, provided the following testimony at trial. Backus interviewed Petitioner with Regas present. Petitioner stated to Backus that the drugs were

his and did not belong to his brother, Clarence. Petitioner indicated he had been working for Scony for approximately one year and was acting as a runner in delivering cocaine, crack, and marijuana in the Hopkins Park area. Petitioner further stated that he made these deliveries approximately once per week, would deliver drugs to Scony for Joe Jones, and would also obtain drugs from Scony to distribute himself. With regard to the drugs seized during the traffic stop, Petitioner indicated he obtained two ounces of crack cocaine, two ounces of powder cocaine, and 12 ounces of marijuana from Scony which was to be delivered to Joe Jones. Petitioner indicated Jones did not have enough money to pay for the drugs, so Petitioner held them. At the conclusion of the interview, Petitioner made the following written statement: "I, Thomas, do state that Clarence Cannon had no knowledge of what was in the vehicle. He had no part in it. I have willingly made this statement of my own free will." Petitioner indicated he wished to cooperate with agents, and was therefore only arrested on his outstanding warrant at the time. Petitioner was released from custody to allow for cooperation, but Petitioner failed to do so. The Government further presented testimony from a representative of Enterprise Leasing and from those responsible for renting the Trailblazer prior to the time of rental by Clarence. These witnesses indicated there were no drugs in the vehicle prior to the rental by Clarence.

      The defense called Clarence to testify at trial. Clarence indicated that he rented the Trailblazer in Rantoul after returning from Kuwait where he was serving in the military. Clarence testified Petitioner never drove the vehicle or had sole access to the vehicle. On the day of Petitioner's arrest, Clarence picked Petitioner up in Champaign and proceeded to their mother's house in Hopkins Park. After they left their mother's house, they went to the house of a friend and it was when they were leaving the driveway that they were stopped by police. Clarence denied that Petitioner confessed to possession of the drugs or offered the officers a bribe. Clarence further indicated that the officers stated they were trying to get Petitioner to make a statement that Clarence was not involved in anything and that the officers stated they were trying to get Petitioner to admit the drugs were his. Clarence further indicated

he would suffer severe consequences if the military learned he was helping Petitioner transport drugs.

Petitioner also testified at trial and indicated he never had sole access to the car. Petitioner denied making any confession to any officer, denied offering the officers a bribe, and stated he only gave the officers a false name because he did not want to be arrested on his outstanding warrant in front of his two year old son. Petitioner also testified that he did not offer to cooperate with the officers, but officers forced him to agree to cooperate or else Clarence would be arrested and his son turned over to the Department of Children and Family Services. Petitioner also indicated the officers stated they would do the same thing unless he signed a written statement indicating Clarence was innocent.

On December 10, 2003, Petitioner was found guilty of the offense charged. On December 16, 2003, Cowan filed a motion for new trial arguing the evidence was insufficient to support Petitioner's conviction and that the court erred in denying his motion to suppress evidence. On March 8, 2004, Petitioner filed a pro se motion seeking to overturn the jury's verdict and to dismiss Cowan as his attorney based upon ineffective assistance of counsel. Petitioner asserted that Cowan failed to present evidence that Petitioner wished to be presented at trial. Petitioner further asserted Cowan had a conflict of interest because Clarence admitted to Cowan that the drugs were his and that Clarence's fingerprints would be found on the drugs. On March 26, 2004, Cowan filed a motion to withdraw. On April 1, 2004, the court allowed Cowan's motion and appointed the Federal Public Defender's office to represent Petitioner.

On September 20, 2004, Petitioner's newly appointed counsel, Tiffani Johnson, filed a motion to compel production of discovery materials that were in Cowan's possession. On November 1, 2004, the court issued a rule to show cause order regarding Cowan's failure to turn over the discovery materials. Thereafter, the court conducted several evidentiary hearings on the rule to show cause. Cowan was called as a witness by Johnson regarding his failure to produce the discovery. Cowan indicated the file had been lost, providing what the court determined to be false testimony concerning what had happened to the file.

Cowan further testified that he only interviewed Petitioner and Clarence in preparation for trial.

Johnson also called several of Petitioner's family members and his girlfriend to testify. Petitioner's girlfriend, Ebony Gowans, testified she was present at a meeting which took place between Cowan, Petitioner, Clarence, and other members of Petitioner's family at Maime Lascola's trailer in which Petitioner's family retained Cowan to represent Petitioner. Gowans indicated that Clarence told Cowan his prints would be found on the drugs and Petitioner told Cowan that his would not. Gowans further indicated that Clarence later sent the money to Petitioner's sister to pay Cowan for his representation. Annie Bradley, Petitioner's sister, testified that she was "under the impression [Cowan] always knew" that the money for his representation was coming from Clarence. Bradley also indicated that Cowan would call Petitioner's mother asking if Clarence had sent any more money to pay for the representation. Lascola testified that she "called [Cowan] for both of my brothers and asked him to meet with them." Lascola further indicated Cowan "told me that he needed $2,000 if they was going to retain him."

On January 19, 2005, the court denied Petitioner's motion for new trial and also denied the subsequent pro se motion for new trial as untimely. Petitioner filed a motion to reconsider the denial of his initial motion for new trial on February 21, 2005. The court denied that motion at the sentencing hearing held on February 25, 2005. The court determined at that sentencing that Petitioner's two prior drug convictions represented only one conviction and sentenced Petitioner to a term of 20 years' imprisonment. Both the Government and Petitioner appealed. The Seventh Circuit Court of Appeals affirmed Petitioner's conviction, but remanded the case with instructions to impose a mandatory life sentence. See United States v. Cannon, 429 F.3d 1158 (7th Cir. 2005). On August 19, 2005, the court found Cowan in contempt of court for giving false testimony concerning the file for Petitioner's criminal case. After remand from the Seventh Circuit, Judge Baker recused himself, and the case was reassigned to this court for resentencing. On March 6, 2006, this court sentenced Petitioner to a mandatory term of

life imprisonment.

On February 26, 2007, Petitioner filed with this court a Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (#1). In this Motion, Petitioner argued that his conviction should be overturned because he received ineffective assistance of counsel in three instances: (1) Attorney Cowan labored under a conflict of interest in that he also represented Clarence, who rented and controlled the car in which the drugs were found and paid Cowan's attorneys' fees; (2) Attorney Cowan failed to investigate Petitioner's case in any meaningful fashion and failed to call certain witnesses who would back up Petitioner's trial testimony that he did not place the drugs in the car; and (3) trial counsel failed to object to the introduction at trial of evidence of other crimes allegedly committed by the Petitioner. The United States filed its Response on July 6, 2007 (#6). On March 13, 2008, this court conducted an evidentiary hearing into the ineffective assistance claims to determine if there was an actual conflict of interest on the part of Attorney Cowan which had an adverse effect on his representation of Petitioner.

Mamie Delores Lascola, of Urbana, was called to the stand at the hearing. Lascola is the older sister of Petitioner. She was involved in obtaining Attorney Cowan's services for her brothers. Both of her brothers, Clarence Cannon and Petitioner, wanted to talk to a lawyer, and she had had dealings with Cowan before, so she recommended him to them. She knew both of her brothers had been stopped in Kankakee, but did not know it was in connection with drugs. She knew Petitioner had been arrested over it. At the time she recommended his services to her brothers, Lascola believed Cowan to be a reputable and ethical attorney. After the recommendation, there was a meeting at her house between several family members and Cowan. She told Cowan that both her brothers were in need of an attorney and that they needed to talk to him about a matter.

The meeting was held at her home in Urbana. She introduced her brothers to Cowan. After the introductions were made, she left them to talk and did not listen in to the conversation. At some point Cowan did speak to Lascola and asked her who was going to pay him. Lascola did not

know how much Cowan was seeking for a fee.

On cross-examination, Lascola testified that she still believed Cowan to be a competent attorney. Lascola admitted to having no knowledge about the payment arrangements, but her mother did tell her that Clarence was paying Cowan's fee. Clarence was concerned about Petitioner and was the one who was employed and making money. She does not have personal knowledge of whether the fee paid to Cowan that day was to represent one or both brothers.

Next to the stand was Petitioner's brother, Clarence Cannon. Clarence, at the time of the hearing, was still in the United States military. Clarence had rented the car from Enterprise and stated that Petitioner had no connection with him renting the vehicle. Both he and Petitioner were arrested by the police after they were stopped and the drugs were found. The next morning he spoke to Lascola about hiring an attorney. Clarence suggested that Lascola set up a meeting with Cowan for he and Petitioner. At the first meeting with Cowan at Lascola's residence, the purpose of the meeting was to hire Cowan to represent both himself and Petitioner because Clarence was not really sure what was going to happen with the case. Clarence never admitted to the police that any of the drugs found were his. At the first meeting with Cowan, neither Clarence nor Petitioner knew who was going to be charged for the drugs. Clarence believed that he needed an attorney, and that Cowan would be that attorney. The understanding at the first meeting was that Cowan would represent both he and Petitioner. Clarence paid Cowan's initial $2,000 retainer fee at Lascola's. Later, through his mother, he paid Cowan additional money. Even though he was never charged, he paid Cowan the money because Cowan told him "Okay, you're not going to be charged with the case" but Clarence still wanted to help his family by paying for the attorney to defend his brother. Clarence and other family members were putting money together to pay for Petitioner's defense. If he had been charged, he would have expected Cowan to represent him due to the $2,000 retainer fee. Clarence could not remember Cowan ever accusing him of being the one who possessed the drugs. He did not remember Cowan ever blaming him for the drugs during Petitioner's

trial.

On cross-examination, Clarence said he was not aware that Lascola said Annie Christine Bradley was the one who paid Cowan the $2,000 retainer. Clarence reiterated that he paid Cowan the retainer but he did not know if Bradley had paid Cowan additional money. He also admitted that when he and Petitioner were picked up by the police, he was not arrested. He still felt he needed to speak to a lawyer to find out what was happening. A few days after the initial meeting at Lascola's Cowan told him that he was applying the entire $2,000 to Petitioner's legal costs because what the police told Clarence was true and that he (Clarence) was not going to be charged with anything. After that, Clarence did not have any further contact with Cowan about Cowan representing him, and only spoke with him in connection with his representation of Petitioner. By the time Petitioner's trial rolled around, Clarence was in Kuwait. On cross AUSA Timothy Bass read to Clarence an affidavit Petitioner had filled out stating that Clarence told Cowan, at Lascola's residence, that the drugs belonged to him (Clarence) and that he (Clarence) wanted Petitioner to take the blame for the drugs so it would not hurt his (Clarence's) military career. Clarence testified that Petitioner's affidavit was not true. Clarence also testified that Petitioner's claims that their brother James and a Frederick Stapleton would say the drugs belonged to Clarence were also not true. Clarence does not know how the drugs wound up in the rental car.

Annie Christine Bradley, Petitioner's older sister, testified next. Bradley testified that she was present at Lascola's house on the day Petitioner and Clarence met with Cowan for the first time to discuss the incident. She testified that she paid Cowan the $2,000 retainer. The money had been given to her by Clarence. Cowan said that if one of them (Petitioner or Clarence) were charged, he would take the case. Bradley had an argument with Cowan later over more money being required to continue on in Petitioner's case. Cowan did not care who paid him, as long as he got paid.

Mammie Cannon was next to testify. She is Petitioner's and Clarence's and Annie's mother. Clarence sent money to her to pay Cowan around six times.

Finally, Judge Harold Baker took the stand. Judge Baker had an uneasy feeling about Cowan early on. Judge Baker testified that what bothered him about Cowan's performance was that a lot of the money paid to Cowan came from Clarence, and that Cowan seemed to be shielding Clarence during the trial. Judge Baker felt that Cowan was shielding Clarence and that, in a way, Petitioner was pleading guilty to protect Clarence. After the trial hearings were held where the subject of some of the hearings was the effectiveness of Cowan. Cowan had lots of excuses as to why he could not participate in hearings and why files were missing, such as floods and fires at his house. However, Judge Baker learned that there was no flood nor was there a fire. Cowan also claimed that he was not being retained by Clarence. Judge Baker did not believe Cowan at all and recommended Cowan's disbarment to the active judges of the district court. Judge Baker also testified that had Cowan objected to the Government's introduction of evidence of Petitioner's attempt to bribe an officer as proof of bad character, he would not have let the evidence in under Federal Rule of Evidence 403. He also would have provided the jury with a limiting instruction on the use of outside criminal acts, but that instruction was never requested by Cowan.

Following the evidentiary hearing, Petitioner filed his "Closing Argument" (#14) on July 21, 2008. The United States filed its Response (#16) on August 15, 2008.

ANALYSIS

Petitioner alleges in his § 2255 motion that Attorney Cowan provided ineffective assistance of counsel and because of that ineffective assistance of counsel Petitioner is entitled to a new trial. In support of his contention, Petitioner raises three arguments: (1) Cowan operated under a conflict of interest, alleging that at the same time he represented Petitioner, he was also representing Clarence Cannon, Petitioner's brother; (2) Cowan was ineffective in failing to adequately investigate Petitioner's case in any meaningful fashion and failed to call certain witnesses on Petitioner's behalf at trial who could have bolstered his testimony that he did not place drugs in the car; and (3) that trial counsel failed to object to the introduction at trial of evidence of other crimes allegedly committed by the Petitioner.

I.  Conflict of Interest

Petitioner's first claim of ineffective assistance is that Cowan operated under a conflict of interest.  Specifically, Petitioner claims that Clarence paid Cowan to represent both himself and Petitioner and that Cowan intentionally provided ineffective counsel to Petitioner during the trial due to Cowan's loyalty to Clarence.   Petitioner argues that his and Clarence's interests were obviously adverse and that Cowan's strategy during the trial was actually to protect Clarence, which had the consequence of Petitioner receiving ineffective representation and being convicted.

"Criminal defendants are guaranteed effective assistance of counsel at all stages of the proceeding against them." Hall v. United States, 371 F.3d 969, 973 (7th Cir. 2004).  Included in this right is the right to be free from conflict of interest in one's legal representation.  Hall, 371 F.3d at 973.  Two ways exist in which to assert a claim based on conflict of interest in one's counsel: (1) Based on Strickland v. Washington, 466 U.S. 668 (1984), a petitioner may show that his counsel had a potential conflict of interest and that the potential conflict of interest prejudiced his defense; (2) under Cuyler v. Sullivan, 446 U.S. 335 (1980), a petitioner must establish a violation by showing that an actual conflict of interest adversely affected his counsel's performance.  Hall, 371 F.3d at 973.  A Cuyler proceeding places a "lighter burden" on the defendant than a Strickland test because demonstrating an "adverse effect" is significantly easier than showing "prejudice."  Hall, 371 F.3d at 973.

In the instant case, Petitioner must proceed under a Cuyler standard as he did not object at trial to any possible conflict of interest on Cowan's part.  "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 348.          Multiple representation does not violate the Sixth Amendment to the United States Constitution unless it gives rise to a conflict of interest.  Cuyler, 446 U.S. at 348.  The possibility of a conflict of interest is insufficient to impugn a criminal conviction.  Cuyler, 446 U.S. at 350.  Rather, to successfully demonstrate a Sixth

Amendment violation, a defendant must show that an actual conflict of interest adversely impacted his counsel's performance. Cuyler, 446 U.S. at 350.

An actual conflict exists when the defense counsel is faced with a choice between advancing his own interests above those of his client. Hall, 371 F.3d at 973. An "actual conflict of interest" is a conflict that affected counsel's performance as opposed to a mere theoretical division of loyalties. Mickens v. Taylor, 535 U.S. 162, 171 (2002). An actual conflict of interest arises only when an attorney is in fact torn between two different interests. United States v. Holman, 314 F.3d 837, 845 (7th Cir. 2002). Allegations of wrongdoing alone, however, do not rise to the level of an actual conflict unless the charges have some foundation. United States v. Jones, 900 F.2d 512, 519 (2nd Cir. 1990).

A showing of a conflict, however, does not automatically entitle a petitioner to reversal. Hall, 371 F.3d at 974. A petitioner must also show an adverse effect. Hall, 371 F.3d at 974. "A petitioner demonstrates an adverse effect by showing that there is a reasonable likelihood that his counsel's performance would have been different had there been no conflict of interest." Hall, 371 F.3d at 974. In third-party payor situations, however, the mere fact that a third party pays a defendant's legal fees is not enough to support a finding of an actual conflict. Cabello v. United States, 188 F.3d 871, 876 (7th Cir. 1999).

In the instant case Petitioner has failed in his burden to show that an actual conflict of interest existed. Taken in its totality, the evidence does not show that Cowan was torn between two different interests. Mamie Lascola did tell Cowan that her brothers were in trouble and needed to talk to an attorney. Lascola also testified that her mother told her Clarence was paying Cowan's fee. However, Lascola admitted to not knowing personally what the payment arrangements were and whether Cowan was paid to represent both Petitioner and Clarence. Petitioner's mother also testified that Clarence paid her money to pay Cowan. Annie Christine Bradley, Petitioner's other sister, testified that on the day Cowan first met with Petitioner and Clarence, Clarence gave her money to pay Cowan. Annie testified

that Cowan said if either Clarence or Petitioner were charged, he would take the case.

The testimony of Petitioner's relatives establishes that Clarence paid Cowan, but it does not establish that Cowan considered Clarence to be a client or that Cowan had divided interests between Petitioner and Clarence that influenced his handling of Petitioner's trial.

Next, the testimony of Clarence established that he paid Cowan the retainer to represent Petitioner and himself, depending on who was charged. The initial meeting was to discuss representation for both he and Petitioner, since they did not know at the time who would be charged with drug possession. Cowan did later tell Clarence that he was not going to be charged with the case, but he continued to pay Cowan because he wanted to help out Petitioner and the family. On cross-examination, Clarence did admit that he was never arrested by police in connection with the drugs. Also, a few days after their initial meeting, Cowan told Clarence that since Clarence would not be charged, Cowan was going to apply the $2,000 retainer towards the defense of Petitioner. After that, Clarence had no further contact with Cowan about Cowan representing him and only talked with Cowan in connection with Cowan's representation of Petitioner. Clarence also testified that the affidavit filled out by Petitioner, claiming that Clarence admitted the drugs were his and that Clarence wanted Petitioner to take the fall so as not to hurt Clarence's military career, was not true.

The testimony of Clarence Cannon establishes that, while the initial purpose of the meeting with Cowan may have been for Cowan to represent both Clarence and Petitioner, once it became clear that only Petitioner would be charged with the drug crime, Cowan shifted entirely to representing Petitioner. Clarence's testimony reveals that only a few days after the initial meeting, Cowan informed him he would not be charged and that Cowan was going to exclusively represent Petitioner on the case. Clarence had no further communication with Cowan as a "client" and only discussed Petitioner's case with him from thereon out. Clarence's testimony does not show that there was any divided loyalty on Cowan's part between Clarence and Petitioner at Petitioner's trial. Rather, the testimony seems to indicate that Cowan

devoted himself solely to Petitioner's defense once it was clear, shortly after the initial meeting, that only Petitioner would be charged and in need of representation.

Finally, Judge Baker's testimony revealed that the judge had an uneasy feeling about Cowan from early in the trial and that he felt that Cowan was shielding Clarence during the trial and was disturbed by the fact that a lot of the money used to pay Cowan was coming from Clarence. Judge Baker felt that, in a way, Petitioner was pleading guilty to protect Clarence. While Judge Baker's concerns should be taken into account, they are just impressions and feelings. As evidence of an actual conflict of interest, they must be taken into account against the greater totality of the evidence.

During the trial Cowan presented a competent defense of Petitioner. The evidence presented by the Government against Petitioner was quite strong. It included the drugs found in the car, Petitioner's confession, on three separate occasions, to the possession of the drugs, and Petitioner's description of his relationship with the drug dealer "Scony." The Government also presented evidence that Petitioner tried to bribe agents in order get rid of the cocaine charge, offered to cooperate, and stated in writing that Clarence had no knowledge of what was in the vehicle. Cowan secured Clarence's appearance for trial where Clarence testified on Petitioner's behalf. Cowan filed a motion to suppress. Cowan tried to argue away Petitioner's confession, insisting he was pressured into it by law enforcement. Cowan argued that Clarence was the person who rented the car in which the drugs were found and that the officers let him go because he was serving with the military in Iraq and they identified with him.

The actions of Attorney Cowan during the trial do not indicate loyalty to any other party except the Petitioner. While it is true that Clarence paid Petitioner's legal fees and Judge Baker felt that Cowan was shielding Clarence, the evidence adduced at the evidentiary hearing from Clarence and Petitioner's sisters, along with the arguments made by Cowan and his actions during the trial, do not show that he had an actual conflict of interest or that there was any adverse effect on his representation of Petitioner so as to rise to the level of ineffective assistance of counsel necessitating a new trial for Petitioner.

II. Cowan's Alleged Failure to Fully Investigate and Call Certain Witnesses

Petitioner's second contention in support of his claim of Cowan's ineffectiveness is that Cowan was ineffective for failing to conduct an adequate investigation and to call witnesses at trial to establish that Petitioner had no opportunity to put drugs in the car. Instead, Cowan only called Clarence and Petitioner as witnesses and rejected the witnesses proposed by Petitioner.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal and a new trial must satisfy two prongs: (1) defendant must show that counsel's performance was deficient and (2) defendant must show that that deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687 (1984). Regardless of when that claim is made, and because counsel is presumed effective, a defendant bears a heavy burden in making out a winning claim based on ineffective assistance of counsel. United States v. Trevino, 60 F.3d 333, 338 (7th Cir. 1995). The convicted defendant must show that his counsel's representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. The purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, but rather to see that a defendant has received a fair trial. Strickland, 466 U.S. at 689. Concerning the performance prong, a defendant must direct the court to the specific acts or omissions which inform his claim and the court must then determine whether, in light of all the circumstances, the alleged acts or omissions were outside the wide range of professionally competent assistance. Strickland, 466 U.S. at 690. There is a strong presumption that counsel's performance was reasonable. Strickland, 466 U.S. at 698.

Under the performance prong of the Strickland test, counsel's performance in the context of the case as a whole is considered and it is viewed at the time of the conduct with a strong presumption that the defendant received effective assistance. Hardamon v. United States, 319 F.3d 943, 948 (7th Cir. 2003). For the second prong of the Strickland test, prejudice, the defendant must show that a reasonable probability exists that, but for his counsel's poor performance, the result of the trial would have been

different.  Hardamon, 319 F.3d at 948.

      In the instant case, Petitioner has not shown that Cowan's failure to investigate and call to the witness stand people suggested to him by Petitioner rises to the level of ineffective assistance.  Going straight to the second prong of the Strickland test, even had Cowan called Petitioner's witnesses who would have claimed Petitioner could not have brought the drugs into the car, the Government still had plenty of evidence saying otherwise from which the jury could have convicted Petitioner.  The Government had at its disposal the location of the drugs in the car, Petitioner's statements and confession to possessing the drugs.  They had his statement of dealing drugs from known drug dealer "Scony" and that he had taken possession of the drugs from Scony with the intent to pass them on.  The implication of Petitioner's argument is that, since his witnesses would show that Petitioner could not possibly be the one who was responsible for the drugs in the car, the blame could then be fixed on Clarence.  The Government, however, could counter with Petitioner's written statement that said: "I, Thomas, do state that Clarence Cannon had no knowledge of what was in the vehicle.  He had no part in it.  I have willingly made this statement of my own free will."  Further, as noted in the Government's initial Response (#6), Petitioner has provided no affidavit from any of the alleged witnesses indicating what testimony they would actually provide.  When a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, that petitioner has the burden of providing the court with specific information as to what that investigation would have produced.  Hardamon, 319 F.3d at 951.  Petitioner has not done that here.  Faced with all this evidence, there is not a reasonable probability that the result of the case would have been different had Petitioner's witnesses testified.

III. Failure to Object to Evidence of Other Crimes Under Federal Rule of Evidence 404(b)

      Petitioner's final contention in his § 2255 Motion is that Cowan was ineffective for failing to object to the Government's introduction into evidence of the statement Petitioner made to police that he had been delivering drugs for "Scony" for about a year.  Petitioner claims that it was evidence of other

crimes, but since Cowan never objected to its admission, the trial court never had the opportunity to consider the four factors under Rule 404(b).  Petitioner also applies the same argument to the Government's introduction of his alleged bribe to the officers.

Again, a convicted defendant's claim that counsel's assistance was so defective as to require reversal and a new trial must satisfy two prongs: (1) defendant must show that counsel's performance was deficient and (2) defendant must show that that deficient performance prejudiced him.  Strickland, 466 U.S. at 687.

Rule 403 of the Federal Rules of Evidence states:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

Rule 404(b) of the Federal Rules of Evidence states:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."  Fed. R. Evid. 404(b).

Petitioner argues that his comments that he had been trafficking drugs for "Scony" for over a year should have been kept out under Rule 404(b) as they were inadmissible evidence of "other crimes" and that Cowan was ineffective for not keeping them out.  There is no need, however, to engage in a 404(b)

analysis if it is clear from the record that this evidence is "intricately related" to the drug possession crime charged. United States v. Ryan, 213 F.3d 347, 350 (7th Cir. 2000). The Seventh Circuit "'has a well-established line of precedent which allows evidence of uncharged acts to be introduced if the evidence is 'intricately related' to the acts charged in the indictment.'" Ryan, 213 F.3d at 350, citing United States v. Gibson, 170 F.3d 673, 680 (7th Cir. 1999). Under the "intricately related" doctrine, evidence of Petitioner's drug dealing relationship with Scony can be admissible if:

>"the evidence is properly admitted to provide the jury with a complete story of the crime on trial, whether its absence would create a chronological or conceptual void in the story of the crime or whether it is 'so blended or connected' that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime." Ryan, 213 F.3d at 350.

So long as those acts falling under the "intricately related" doctrine are not unfairly prejudicial under Rule 403, they are admissible. United States v. Miller, 327 F.3d 598, 603 (7th Cir. 2003).

In the instant case, it was Petitioner himself who uttered the self-incriminating line about having been working for Scony for over a year delivering drugs, such as cocaine, crack, and marijuana in the Hopkins Park area. He even named Joe Jones as the person he would deliver the drugs to for Scony. With regard to the specific drugs found in the car during the traffic stop, Petitioner told the police that those were indeed drugs obtained from Scony to be delivered to Joe Jones. The evidence of other crimes is clearly intricately related to the crimes with which Petitioner was charged. Further, Petitioner's statement of delivering crack, cocaine, and marijuana for Scony to Joe Jones for over a year is so "blended" or "connected" to the crime of Petitioner's possession with intent to distribute cocaine, crack, and marijuana (which he said he was delivering on Scony's behalf to Joe Jones) that it helps explain the circumstances surrounding the crime charged and falls squarely under the "intricately related doctrine." See Ryan, 213 F.3d at 350.

-18-

As such, those statements help lay a foundation for the jury as to the circumstances and background of Petitioner's crime, and the probative value outweighs any prejudicial impact under Rule 403. Petitioner's statements were admissible. Cowan's failure to object to them, taking into account the strong presumption that counsel's actions are reasonable, does not rise to the level of deficient performance so as to justify calling his representation of Petitioner ineffective and necessitating a new trial.

Petitioner next argues that Cowan's failure to object to the Government's introduction into evidence of Petitioner's attempted bribe of the officers was ineffective assistance of counsel.

The Seventh Circuit and other circuits have long accepted the admission of evidence of a defendant's attempt to influence a prosecution witness as evidence of his guilty conscience for the underlying crimes. United States v. Henderson, 58 F.3d 1145, 1150 (7th Cir. 1995); See also United States v. Linarez-Delgado, 259 Fed.Appx. 506, 508 (3rd Cir. 2007). Here, Petitioner attempted to bribe the officers by offering all the money he and his brother had if they would dispose of the cocaine. It is clearly an attempt at a bribe, and the case law is well established that this type of evidence is admissible at trial as showing consciousness of guilt. It is also relevant and the probative value is not outweighed by any prejudicial effect. As such, it was not unreasonable for Cowan to decide not to object to its admission, and was not ineffective assistance of counsel.

IV. Constitutionality of Petitioner's Mandatory Minimum Life Sentence

Petitioner also claims that the mandatory minimum life sentence under which he has been sentenced is unconstitutional. Defendant was originally sentenced to 20 years in prison because the trial court found that Petitioner's two prior convictions were actually just one conviction. This was later overturned and remanded by the Seventh Circuit for imposition of a life sentence, which this court then imposed in 2006. See United States v. Cannon, 429 F.3d 1158, 1161 (7th Cir. 2005).

Petitioner's claim is without merit. The Seventh Circuit has found that 21 U.S.C. § 841(b) is

constitutional.  United States v. Sowemimo, 335 F.3d 567, 570 (7th Cir. 2003).  In fact, the Seventh Circuit has already found that a life sentence for this particular Petitioner is appropriate under § 841(b)(1)(A) and ordered it imposed.  Cannon, 429 F.3d at 1161.  Therefore, Petitioner's claim fails.

Petitioner's Motion to Vacate, Set Aside or Correct a Conviction and Sentence (#1) is therefore DENIED IN FULL.

IT IS THEREFORE ORDERED THAT

(1) Petitioner' Motion to Vacate, Set Aside or Correct a Conviction and Sentence (#1) is DENIED IN FULL.

(2) The Status Hearing set for 9/17/08 at 11:00 am is VACATED.

(3) This case is TERMINATED.

ENTERED this 9th day of September, 2008

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE